IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NORTH COUNTY COMMUNICATIONS                3:13-CV-00375-BR
CORPORATION OF OREGON,

       Plaintiff,                          OPINION AND ORDER

v.

QWEST CORPORATION, SUSAN
AKERMAN, JOHN SAVAGE, STEPHEN
BLOOM, all in their capacity
as Commissioners of the
Public Utility Commission of
Oregon,

       Defendants.


ANTHONY EDWARD MCNAMER
DEBORAH E. GUMM
McNamer and Company, PC
1400 S.W. Fifth Ave.
Suite 300
Portland, OR 97201
(503) 727-2504

R. DALE DIXON, JR.
Law Offices of Dale Dixon
1155 Camino Del Mar #497
Del Mar, CA 92014
(858) 688-6292

      Attorneys for Plaintiff


1 - OPINION AND ORDER

**LAWRENCE H. REICHMAN**
Perkins Coie, LLP
1120 N.W. Couch Street
10th Floor
Portland, OR 97209-4128
(503) 727-2019

      Attorneys for Defendant
      Quest Corporation


**ELLEN F. ROSENBLUM**
Attorney General
**MICHAEL TODD WEIRICH**
Oregon Department of Justice
1162 Court Street, N.E.
Salem, OR 97301
(503) 947-4789


**DARSEE STALEY**
Oregon Department of Justice
Trial Division, CC&E Section
1515 S.W. Fifth Avenue, Suite 410
Portland, OR 97201
(971) 673-1880

      Attorneys for Defendant
      Commissioners of the Public
      Utility Commission Of Oregon
      (hereinafter collectively
      referred to as the Commission)


**BROWN, Judge.**

This matter comes before the Court on the Motion (#21) of Plaintiff North County Communications Corporation of Oregon (NCC) for Summary Judgment, the Cross-Motion (#29) for Summary Judgment of Defendant Qwest Corporation, and the Cross-Motion (#34) for Summary Judgment of the Commission.

For the reasons that follow, the Court **DENIES** NCC's Motion (#21) and **GRANTS** the Cross-Motions (#29, #34) of Qwest and the

2 - OPINION AND ORDER

Commission.

## BACKGROUND

NCC brings this action against Qwest and the Commission seeking declaratory and injunctive relief from the determinations and the orders of the Public Utility Commission of Oregon (PUC). NCC alleges the determinations and orders violate the Communications Act of 1934, 47 U.S.C. § 151, *et seq.*, as amended by the Telecommunications Act of 1966 (the Act), Pub L. No. 104-104, 110 Stat. 56 and are preempted by the Act.

**I.   Facts**

The facts in this matter are undisputed unless otherwise noted.

**A.    The 1997 Interconnection Agreement (1997 ICA)**

NCC is certified by the PUC as a competitive local exchange carrier (CLEC).  Defendant Qwest was and is an incumbent local exchange carrier (ILEC).  Defendants Susan Ackerman, John Savage, and Stephen Bloom were Commissioners of the PUC at all relevant times.  NCC and Qwest entered into the 1997 ICA, which the Commission approved in Docket No. ARB 39 by Order No. 97-449 and which went into effect on approximately November 20, 1997.

Section XXXIV(V) of the 1997 ICA provides:

> This Agreement shall be effective for a period of 2 ½ years, and thereafter the Agreement shall continue in force and effect until a new agreement, addressing all

of the terms of this Agreement, becomes effective
between the Parties.  The Parties agree to commence
negotiations on a new agreement no later than two years
after this Agreement becomes effective.

Section XXXIII of the 1997 ICA provides:

Within 4 months from the date of final approval of this
Agreement, the Parties agree to make a good faith
effort to complete each of the following
interconnection arrangements: . . .  [Signaling System
No. 7 (SS7)] Interconnection and Certification.

**B.    Administrative Proceedings**

NCC and Qwest amended the 1997 ICA several times between

September 1997 and April 2011.  In July 2008 NCC received a

request for negotiation from Qwest regarding a new ICA pursuant

to 47 U.S.C. § 252(a).  Qwest sought a new ICA because the 1997

ICA was outdated due to technological changes in Qwest's

processes and products and NCC's use of multifrequency (MF)

(analog) signaling was archaic.  Thus, even though Qwest was

willing to accommodate MF signaling for traffic terminating to

NCC, Qwest requested the new ICA include a provision that NCC

must use SS7 (digital) signaling if it wished to begin

terminating traffic with or through Qwest.  NCC, in turn,

contended Qwest's proposed new ICA would force NCC to get rid of

its existing network in favor of an "unnecessary technological

update and an untested agreement."  AR at 1445.  NCC also

asserted Qwest was not legally permitted to dictate NCC's

technology choices and did not have a valid justification for

changing the terms of the then-existing 1997 ICA.

4 - OPINION AND ORDER

NCC and Qwest agreed to a series of extensions of the arbitration window for the filing of a petition for arbitration. They were unable to settle the matter informally.  On April 5, 2010, NCC filed a Motion to Dismiss Qwest's request for arbitration in which NCC challenged the Commission's jurisdiction to arbitrate a new ICA.  The arbitrator denied the Motion.  On May 14, 2010, NCC filed with the Commission a Request to Certify the Arbitrator's May 10, 2010, Ruling denying the Motion to Dismiss.  The Commission affirmed the arbitrator's May 10, 2010, Ruling.

The Parties exchanged testimony and exhibits in June, July, and August 2010.  The arbitration was heard on August 18, 2010, before PUC Administrative Law Judge, Shani Pines (the Arbitrator).

On January 21, 2011,[1] the Arbitrator issued her ruling in which she approved the proposed ICA (2011 ICA) submitted by Qwest with certain modifications.  The Arbitrator's ruling addressed the following four issues as presented by the parties:

> **Signaling (ICA 2011 Sections 7.1.1 and 7.2.1.1):**  The Arbitrator concluded although North County is entitled to request interconnection with Qwest, it may not force Qwest to continue using an outdated technology such as MF signaling to do so.  AR 1447.  The Arbitrator,

---

[1]  The Court notes this date was erroneously identified as February 11, 2011, in the parties' Joint Statement of Agreed Facts (#20), but the date was corrected by stipulation of the parties at oral argument as reflected in Order (#49) issued by this Court on February 13, 2014.

therefore, approved Sections 7.1.1 and 7.2.1.1 of Qwest's proposed ICA.  AR at 1446-47.

**Billing Methodology (ICA 2011 Section 7.8):**  Qwest proposed a cap on billable minutes of use (MOU) because Qwest is unable to verify traffic with NCC's use of MF signaling (and thus determine if all minutes billed by North County are compensable).  The Arbitrator found Qwest adequately demonstrated through testimony and evidence that its proposed cap to permit North County to use MF signaling "without exposing Qwest to undue risk as a result."  Accordingly, the Arbitrator adopted a modified cap of "240,000 minutes of use per service DS1" to be applied on an averaged basis.  AR at 1448-49.

**Relative Use Factor (ICA 2011 Sections 7.3.1.1.3.1 and 7.3.2.2.1):**  RUF appears to have to do with compensation (or "cost sharing") for the exchange of traffic between NCC's and Qwest's network.  Qwest proposed 99 percent of the costs should be assigned to it and 1 percent to NCC.  The Arbitrator noted neither party submitted data regarding the parties' historical relative use to demonstrate what the cost sharing should be under Qwest's proposed RUF.  Accordingly the Arbitrator adopted Qwest's proposed sharing of 99 percent to 1 percent as an initial sharing and, included in the ICA if the actual usage between the parties turns out to be 100 percent to 0 percent, NCC may seek recalculation of the costs.  AR at 1449-50.

**VNXX Traffic (ICA 2011 Section 7.2.1.2):**  The Arbitrator adopted language on VNXX Traffic that the Arbitrator found implemented the PUC's requirements regarding VNXX Traffic.[2]  AR at 1450-51.

On February 3, 2011, NCC filed its Comments on the Arbitrator's decision.  The Commission adopted the Arbitrator's decision and deemed the 2011 ICA approved on April 13, 2011.

---

[2]  NCC does not appear to specifically contest this provision.

**C.   MF Signaling**

At all relevant times more than 99 percent of the traffic between NCC and Qwest is transmitted from Qwest to NCC.  NCC is the only CLEC in Oregon that interconnects with Qwest using MF signaling exclusively.  NCC has never interconnected with Qwest using SS7 signaling.

The 2011 ICA allows NCC to continue using MF signaling as long as the flow of traffic is one-way from NCC to Qwest and provides for a billing procedure for identification of compensable local call minutes.  At least one carrier in Oregon currently interconnects with Qwest using the same 1997 ICA that Qwest had with NCC.

**II. NCC's Claims**

NCC asserts the following claims in its Complaint:

Claim 1:  Invalidity of Petition - The Commission erred when it found Qwest's Petition was sufficient to invoke the Commission's jurisdiction.

Claim 2:  Lack of Jurisdiction - The Commission erred when it found it had jurisdiction to arbitrate and to approve a renegotiation of the ICA between NCC and Qwest even though the parties already had a controlling and valid ICA (1997 ICA).

Claim 3:  Invalidity of Provisions of Arbitrated ICA - NCC challenges the validity of §§ 7.1.1, 7.2.1.1, 7.3.1.1.3.1, 7.3.2.2.1, 7.6, and 7.8 of the 2011 ICA as well as the

7 - OPINION AND ORDER

Commission's alleged refusal to permit NCC to interconnect with Qwest using voice-over Internet protocol (VoIP) technology and the Commission's alleged refusal to require a reciprocal payment obligation on Qwest to pay its portion of use of NCC's mutiplexer (MUX).

## STANDARDS

Federal courts have jurisdiction to consider issues arising from the negotiation of ICAs pursuant to 47 U.S.C. § 252(e)(6). Section 252(e)(6) provides:  "In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of [title 47] and [section 252]."

In appeals of interconnection arbitration decisions, the Court reviews *de novo* a state commission's determinations of law and implementing regulations under the Act, but an arbitrary and capricious standard applies to all other issues.  *Verizon California, Inc. v. Peevey*, 462 F.3d 1142, 1150 (9th Cir. 2006). *See also U.S. WEST Commc'ns, Inc. v. Jennings*, 304 F.3d 950 (9th Cir. 2002); *U.S. WEST Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1117 (9th Cir. 1999).  "A state commission's determination is arbitrary and capricious if the decision 'was not supported by

substantial evidence,' or the commission made a 'clear error of judgment.'"

The Court's review is confined to the record that was before the Commission. *Qwest Corp. v. Arizona Corp. Comm'n*, 496 F. Supp. 2d 1069, 1074-75 (D. Ariz. 2007), *aff'd by* 567 F.3d 1109 (9th Cir. 2009).

## DISCUSSION

### I.   The Commission's Authority to Conduct Arbitration

NCC contends the Act prohibited Quest (as an ILEC) from demanding interconnection negotiations with NCC (as a CLEC). NCC asserts, therefore, that the Commission violated the Act; that it did not have the authority to approve the 2011 ICA; and, therefore, the 2011 ICA should be declared *void ab initio*.

The Commission and Qwest, in turn, contend (1) Qwest had the authority to request arbitration, and, therefore, the Commission had jurisdiction to decide the 2011 ICA; (2) some of the issues raised by NCC now are not properly before this Court because NCC did not raise them at the administrative level, and, therefore, they were not addressed by the Arbitrator or the Commission; and (3) the Commission's decisions as to the remaining issues were lawful and supported by substantial evidence in the record.

### A.   The Commission's Authority to Arbitrate

Section 252(a)(1) directs telephone carriers to negotiate

ICAs.  Section 252 (a)(1) provides:

> Upon receiving a request for interconnection, services, or network elements pursuant to section 251 [47 U.S.C. § 251], an incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers without regard to the standards set forth in subsections (b) and (c) of section 251 [47 USC § 251(b), (c)].

After negotiations have been initiated under § 252(a)(1), the parties may ask the local state utility commission "to participate in the negotiation and to mediate any differences arising in the course of the negotiation."  42 U.S.C. § 252(a)(2).  All ICAs must be submitted for approval to the state commission.  42 U.S.C. 252(e)(1).

NCC argues the negotiation and arbitration provisions of §§ 252(1)(a) and (b)(1) apply only in situations where a CLEC has requested interconnection with an ILEC rather than, as here, where an ILEC (Qwest) has requested interconnection with a CLEC (NCC).  NCC contends, therefore, that Qwest was not permitted to demand interconnection with NCC through arbitration, and, accordingly, the Commission lacked the authority to arbitrate the 2011 ICA.

The Court notes North County Communications Corporation of Arizona, a company related to NCC, made this same argument in *North County Communications Corp. of Arizona v. Qwest Corp.* (*NCC Arizona*), No. CV-13-00466-PHX-DGC, 2013 WL 6804199 (D. Ariz., 2013).  Defendant Qwest in this case was also a defendant in *NCC*

10 - OPINION AND ORDER

*Arizona*.  The district court in *NCC Arizona* noted:  "[N]o court has directly considered whether the language of sections 252(a)(1) and (b)(1) applies to requests to negotiate made by ILECs to CLECs."  *Id.,* at *2.  Accordingly, the *NCC Arizona* court analyzed the language of the Act to ascertain Congress's intent to determine whether to adopt NCC's interpretation of the statute.  After doing so, the court found:  "Any interpretation of sections 252(a)(1) and (b)(1) must be consistent with these two basic objectives of the Act:  encouraging competition through the good faith negotiation of ICAs by ILECs and CLECs, and placing state commission in the central role of mediating, arbitrating, and approving ICAs."  *Id.,* at *5.  Accordingly, the court concluded "North County's strict reading of sections 252(a)(1) and (b)(1) would be inconsistent with these objectives," and "the most reasonable construction is that [S]ection 252 applies to any negotiation of an ICA between an ILEC and CLEC, regardless of which party initiates the discussions.  Such a reading avoids an interpretation that defeats major purposes of the Act and that places ILECs in the untenable position of having to terminate existing ICAs rather than requesting to renegotiate them.  It also preserves for state commissions the critical mediation, arbitration, and approval roles intended by Congress."  *Id.,* at *5-6.

The *NCC Arizona* court noted its conclusion on this issue was

consistent with the opinion of the Federal Communications Commission (FCC) that "[a]lthough section 252(a)(1) and section 252(b)(1) refer to requests that are made to incumbent LECs, we find that in the interconnection amendment context, either the incumbent or the competitive LEC may make such a request, consistent with the parties' duty to negotiate in good faith pursuant to section 251(c)(1)." *Id.,* at *6 (quoting *In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, 18 F.C.C.R. 16978, 2003 WL 22175730, at ¶ 703 n.2087 (2003)).

The Court agrees with the *NCC Arizona* court that § 252(a)(1) does not prohibit an ILEC from requesting interconnection with a CLEC.  The Court concludes, therefore, that Qwest was permitted to request arbitration and the Commission had the authority to arbitrate the parties' 2011 ICA.  Accordingly, the Court declines to declare the 2011 ICA void *ab initio*.

## II.  Challenges to Specific Portions of the 2011 ICA

### A.    Newly-Raised Issues

In the alternative to declaring the 2011 ICA void, NCC requests the Court to strike certain sections of the 2011 ICA.

Qwest and the Commission contend NCC has presented five issues in its Motion that were not presented to the Commission in the administrative hearing, and, therefore, the Court should not consider those issues.  These five new issues are:

12 - OPINION AND ORDER

(1)  Challenges to the multiplexing (MUX) charges
(2)  Challenges to installation charges
(3)  Challenges to call-detail records
(4)  Request that Qwest should be required to interconnect with NCC using VoIP Technology
(5)  Request that Qwest should be required to exchange traffic with NCC through third-party tandem providers.

47 U.S.C. 252(b)(4)(A) provides:  "The State commission shall limit its consideration of any petition under paragraph (1) (and any response thereto) *to the issues set forth in the petition* and in the response, if any, filed under paragraph (3)." Emphasis added.  The PUC's administrative rules provide a similar limitation:  "Respondent may file a response within 25 days of the request for arbitration.  In the response, the respondent *shall address each issue listed* in the request, describe the respondent's position on those issues, and identify and present any additional issues for which the respondent seeks resolution." Or. Admin. R. 860-016-0030(3)(emphasis added).  Additionally, 47 U.S.C. § 252(e)(6) limits the scope of the court's review to the Commission's actual determinations:  "In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 [47 U.S.C. § 251] and this section."  The Ninth Circuit has held a party is precluded from raising for the first time in district court an issue that was neither addressed by the state utility

13 - OPINION AND ORDER

commission nor raised by the party at the administrative level. *Western Radio Servs. Co. v. Qwest Corp.*, 678 F.3d 970, 979 (9th Cir. 2012)("Because the issue of Qwest's good faith was never properly presented to, nor decided by, the PUC, Western is precluded from attempting to raise that issue for the first time in the federal courts.").

In light of the fact that (1) the Commission is only able to render a decision on issues that were presented to it during the administrative proceedings; (2) NCC failed to preserve these issues at the administrative level; and (3) the Commission did not make a determination regarding MUX charges, installation charges, call-detail records, VoIP Technology, and traffic exchange through third-party tandem providers, the Court declines to consider NCC's challenges as to these five issues.

**B.   Challenges to Sections of the 2011 ICA addressed by the Commission**

**1.   Signaling – Sections 7.1.1 and 7.2.1.1**

As stated by the Commission in its order, "[t]he parties' primary dispute concerned North County's continued use of multi-frequency (MF) signaling, instead of the more modern Signaling System No. 7 (SS7) signaling used by Qwest."  AR at 1441.  NCC currently does not send traffic to Qwest, but NCC contends it should be permitted to use MF signaling in the future if it chooses to do so.

The arbitrator concluded even though NCC is entitled to

14 - OPINION AND ORDER

request interconnection with Qwest, NCC may not force Qwest to
continue using an outdated technology such as MF signaling.
AR at 1446-47.  The Arbitrator, therefore, approved §§ 7.1.1 and
7.2.1.1 of Qwest's proposed ICA.  Those sections accommodate
NCC's continued use of MF signaling by allowing NCC "to terminate
traffic using MF signaling."  In the event NCC wishes to
originate traffic to send to Qwest, however, the parties are to
"mutually negotiate an amendment to [the 2011 ICA] which shall
also include requirements for the use of S77 signaling in the
mutual exchange of traffic."  AR at 1517.

        NCC contends the requirements in §§ 7.1.1 and 7.2.1.1
of the 2011 ICA require NCC to change its technology to SS7 in
violation of § 252(I) of the Act.  Section 252(I) provides an
ILEC "shall make available any interconnection, service, or
network element provided under an agreement approved under this
section to which it is a party to any other requesting
telecommunications carrier upon the same terms and conditions as
those provided in the agreement."  NCC also argues §§ 7.1.1 and
7.2.1.1 violate § 252(I) because they preclude NCC from "opting
in" to "other non-restrictive ICAs."  As noted by the *NCC Arizona*
court, however, § 252(I) does not allow a CLEC to "pick and
choose" provisions from other ICAs, but instead allows a CLEC to
opt in to an entire ICA of another CLEC.  *NCC Arizona*, 2013 WL
6804199, at *8.  Because the plaintiff in *NCC Arizona* did not

15 - OPINION AND ORDER

"seek such a wholesale adoption of another ICA," the court
concluded § 252(I) did not apply.  *Id.*  Here NCC has not
identified or sought adoption of a different ICA.  Accordingly,
the Court does not find persuasive NCC's argument that §§ 7.1.1
and 7.2.1.1 of the 2011 ICA violate § 252(I) of the Act.

NCC further contends §§ 7.1.1 and 7.2.1.1 are
discriminatory because NCC is the only carrier in Oregon that
Qwest restricts from terminating calls to Qwest.  Nevertheless,
NCC agrees it "is the only CLEC in Oregon that interconnects with
[Qwest] using exclusively MF signaling."  Joint Statement of
Agreed Facts at 5-6.  Moreover, as pointed out by Qwest, the
evidence in the record shows other CLECs only use MF signaling to
connect with Qwest for specialized services (such as 9-1-1 calls
where there is not a need for the capabilities of SS7 signaling)
rather than, as here, interconnection for local telephone
traffic.  AR at 984.

In reaching her decision on this issue, the Arbitrator
relied on the court's holding in *Western Radio Services Company
v. Qwest Corporation* in which the court concluded the Act does
not require an ILEC to interconnect with carriers through
lesser-quality facilities.  734 F. Supp. 2d 1139, 1152 (D. Or.
2010), *rev'd on other grounds by* 678 F.3d 970 (9th Cir. 2012).
The Arbitrator also relied on evidence in the record that MF
signaling is "essentially obsolete" and that SS7 signaling is

16 - OPINION AND ORDER

more efficient, flexible, and reliable than MF signaling.  AR
977-86, 1089.  Accordingly, the Commission contends its
conclusion that Qwest's requested use of SS7 was lawful and
appropriate.  The Court agrees.

Accordingly, the Court does not find support in the
record for NCC's contentions that §§ 7.1.1 and 7.2.1.1 are
discriminatory and concludes the Commission's decision to adopt
§§ 7.1.1 and 7.2.1.1 of the 2011 ICA was supported by substantial
evidence in the record and complies with the Act.

### 2.   Billing Methodology - Section 7.8 of the 2011 ICA

Qwest contends NCC's use of MF signaling has caused
dozens of billing disputes and resulted in Qwest significantly
overpaying NCC.  As a result of the inaccurate billing resulting
from NCC's use of MF signaling, Qwest requested and the
Commission approved a cap of 240,000 MOU for which Qwest may be
required to pay NCC for the average DS1 circuit.  AR at 1427.
According to the Commission, the purpose of the cap is to provide
fair compensation to NCC while protecting Qwest from billing
problems arising out of NCC's use of MF signaling.  The cap was
"based on NCC's historical traffic with an added buffer to allow
for growth."  AR at 1448.

NCC contends § 7.8 of the 2011 ICA imposes an
arbitrary, prejudicial, and unlawful cap on MOUs that Qwest will
pay to NCC for terminating Qwest's calls to NCC when such

17 - OPINION AND ORDER

termination employs MF signaling.[3]  NCC argues the cap is
unlawful because it arbitrarily deducts 60 percent[4] from NCC's
invoices, the cap does not provide for an adequate growth rate,
and Qwest is able to accurately track NCC's usage from NCC's
current network configuration.

     The Commission contends the Arbitrator properly
concluded the cap would provide fair compensation to NCC and
protect Qwest from the billing problems that arose from NCC's use
of its outdated MF technology.  The Commission points out that
the Arbitrator's conclusion is supported by evidence in the
record, including the testimony of Renee Albersheim, a Qwest
Staff Witnessing Representative in the Wholesale Markets
organization.  Albersheim testified about the actual usage data
for NCC upon which the cap was based.  *See* AR at 1019, 1073,
1442.

     The Commission and Qwest argue NCC did not present its
own evidence regarding usage or controvert Qwest's evidence on
this issue.  NCC does not dispute this point.  The Commission
further argues the cap is not discriminatory in light of the fact
that there is no other CLEC that uses MF signaling for

---

     [3]  In its argument, NCC misstates the cap in § 7.8 as
400,000 rather than 240,000.  The Court considered NCC's argument
as if it had correctly stated the cap.

     [4]  NCC argued at the administrative level that the alleged
discount was 76 percent.  AR at 1448.

interconnection with Qwest.

In light of the fact that the cap is based on evidence of NCC's actual usage and was rounded up to allow for growth, the Court concludes the Commission's decision to approve § 7.8 of the 2011 ICA is supported by substantial evidence in the record and is not arbitrary and capricious.

**C.   Relative Use Factor (RUF) – Sections 7.3.1.1.3.1 and 7.3.2.2.1 of the 2011 ICA**

Sections 7.3.1.1.3.1 and 7.3.2.2.1 of the 2011 ICA impose a RUF that assigns 99 percent of the costs of two types of trunk facilities to Qwest and one percent to NCC.  These trunk facilities are used to transmit local traffic between Qwest and NCC's networks.  The parties agree the FCC's rules permit an ILEC to charge for such transmission facilities in proportion to the amount of traffic that originates on the CLEC's network and terminates on the ILEC's network.  *See* 47 C.F.R. 51.703(b), *Qwest Corp. v. Universal Telecom, Inc.*, 2004 U.S. Dist. LEXIS 28340, at *9 (D. Or. 2004).

At the arbitration both parties proposed a ratio for calculation of the RUF, but neither party submitted data regarding the parties' historical relative use.  Accordingly, the Arbitrator found there was not adequate data to support the parties' proposals.  Nevertheless, the Arbitrator concluded it was reasonable to adopt Qwest's proposed 99-to-1 RUF, but with

the allowance that the RUF could be changed to NCC's requested 100-to-0 RUF in the event future usage supports NCC's position. AR 1449-50.

NCC contends the challenge to the RUF violates a "clear prohibition" against charging NCC more than its proportionate share of facilities used to exchange traffic.  NCC contends because all of the traffic exchanged between it and Qwest originates on Qwest's network, Qwest may not impose charges on NCC for facilities used to exchange traffic that originated and terminated on Qwest's network.  NCC, however, has not identified any evidence in the record that shows it originates traffic on Qwest's network nor does it dispute the fact that it did not present any data on this issue at the administrative level.

In light of the fact that the parties did not present data regarding actual RUF and §§ 7.3.1.1.3.1 and 7.3.2.2.1 provide for the RUF being changed to NCC's requested 100-to-0 to reflect actual usage, the Court concludes the Commission's adoption of the 99-to-1 RUF was not arbitrary and capricious.

**CONCLUSION**

For these reasons, the Court **DENIES** NCC's Motion for Summary Judgment (#21), **GRANTS** the Cross-Motions (#29, #34) for Summary Judgment of Qwest and the Commission respectively, and **DISMISSES** this matter **with prejudice**.

IT IS SO ORDERED.

DATED this 5th day of March, 2014.

/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge

21 - OPINION AND ORDER